UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA :
: 23 Cr. 286 (NSR)
- v. - :
:
JOHN CHEN, :
:
       Defendant. :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# GOVERNMENT'S SENTENCING MEMORANDUM

 

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Qais Ghafary
Michael D. Lockard
Kate Wheelock
Assistant United States Attorneys
   *Of Counsel*

## TABLE OF CONTENTS

Page

Background ...................................................................................................................................1

 A. The Offense ...............................................................................................................1

 B. The Defendant's Guilty Plea.....................................................................................7

 C. The Presentence Report ............................................................................................8

 D. The Defendant's Sentencing Submission ................................................................8

DISCUSSION ...............................................................................................................................8

 I. Applicable Law .........................................................................................................8

 II. Application .............................................................................................................10

  A. The Sentencing Guidelines.........................................................................10

  B. The Defendant's History and Characteristics ............................................10

  C. Seriousness of the Offense and the Need for Deterrence ..........................13

  D. Sentences in Similar Cases .........................................................................15

CONCLUSION............................................................................................................................17

The Government respectfully submits this memorandum in connection with the sentencing of the defendant, John Chen, scheduled for November 19, 2024. For the reasons set forth below, a sentence of 30 months' imprisonment is appropriate to serve the legitimate purposes of sentencing, 18 U.S.C. § 3553(a).

## BACKGROUND

On May 24, 2023, the defendant and his co-defendant, Lin Feng, were charged in a criminal Complaint, 23 Mag. 4263 (the "Complaint"), with one count of conspiring to act as an agent of a foreign government without notifying the attorney general and to bribe a public official, in violation of Title 18, United States Code, Section 371 (Count One); one count of acting as an agent of a foreign government without notifying the attorney general, in violation of Title 18, United States Code, Sections 951 and 2 (Count Two); one count of bribing a public official, in violation of Title 18, United States Code, Sections 201(b) and 2 (Count Three); and one count of conspiring to commit money laundering, in violation of Title 18, United States Code, Section 1956(h) (Count Four).

On June 9, 2023, the defendants were charged in an indictment, 23 Cr. 286 (NSR) (the "Indictment"), with the same offenses. On July 24, 2024, the defendant pleaded guilty pursuant to a plea agreement to Counts Two and Three of the Indictment.

### A.    The Offense

The charges in this case arise out of the defendant's participation in a scheme by the government of the People's Republic of China ("PRC") to harass, intimidate, disrupt, and otherwise repress practitioners of Falun Gong, a spiritual practice that is banned in the PRC.

### 1. The PRC Government's Campaign of Repression Against the Falun Gong

Falun Gong (or Falun Dafa) is a spiritual practice that has been officially banned in the PRC since on or about June 10, 1999. The PRC Government has designated the Falun Gong as one of the "Five Poisons," or one of the top five threats to its rule. Falun Gong adherents face a range of repressive and punitive measures from the PRC Government, including imprisonment, and some adherents have died because of this persecution. The PRC Government's efforts to repress the Falun Gong are centralized in a particular PRC Government department, which is known as the "610 Office." That moniker was derived from the date (June 10, 1999) that the PRC Government officially banned the Falun Gong. (PSR ¶¶ 16-18.)

### 2. The IRS Whistleblower Complaint Scheme

As part of this campaign of repression, Chen and his co-defendant, Lin Feng, sought to have the tax-exempt charitable status of a Falun Gong entity, the Shen Yun Performing Arts Center ("Shen Yun"), revoked, using a whistleblower complaint through the Internal Revenue Service's ("IRS") Whistleblower Program. (*Id.* ¶ 15.) The IRS Whistleblower Program is designed to reward individuals who provide information that the IRS may use to collect otherwise uncollected taxes. By statute, the IRS is required to award at least 15 percent but not more than 30 percent of the proceeds collected to whistleblowers who provide actionable information for the IRS. (*Id.* ¶ 19.) Chen prepared, or caused the preparation of, a whistleblower complaint against Shen Yun that attempts to characterize Falun Gong as a "cult," the same rhetoric typically invoked by the Government of the PRC. (*Id.* ¶ 21.). The whistleblower complaint was facially deficient and does not qualify for the IRS Whistleblower Program. (*Id.* ¶ 22.)

### 3. Chen Makes Plans to Bribe an IRS Official to Revoke Shen Yun's Charitable Status and "Topple" the Falun Gong

In approximately January 2023, Chen discussed the whistleblower complaint, which Chen already had been pursuing, with another person (referred to in the Complaint and Indictment as "Individual-1"). The whistleblower complaint was an effort on behalf of the Government of the PRC to "topple . . . the Falun Gong." Chen and the Government of the PRC sought to bribe someone at the IRS to advance the whistleblower complaint. As Chen described it, PRC "leadership" was "very generous." (*Id.* ¶ 23.) About a week later, Chen emphasized to Individual-1 that "after this-this-this thing is done" – referring to a potential IRS investigation into the Falun Gong – "reward for work will surely be given at that time." (*Id.* ¶ 24.)

### 4. Chen Arranges to Meet With Agent-1, a Purported IRS Agent

Chen later mailed the whistleblower complaint to a law enforcement officer acting in an undercover capacity as an IRS agent (described in the Complaint and Indictment as "Agent-1"), whom Individual-1 said could potentially help Chen with his scheme. (*Id.* ¶ 23-24.) The PRC Government was interested in trying to work with Agent-1, but first wanted to get more information about him. (*Id.* ¶ 28.) Chen, after traveling to China, spoke to Individual-1 and introduced Individual-1 to a PRC Government official (described in the Complaint and Indictment as "PRC Official-1"), who said he (PRC Official-1) wanted Chen to meet with Agent-1 in person. (*Id.* ¶¶ 27, 29-30.)

Shortly thereafter, on March 25, 2023, Chen contacted Agent-1 by email and, during the ensuing exchange, set up a meeting with Agent-1 for May 15, 2023, at the IRS New Windsor

Office to debrief regarding the Chen Whistleblower Complaint (the "May 15 Meeting").[1] (*Id.* ¶ 30.) Chen also asked to meet Agent-1 the day before the official May 15 Meeting (the "May 14 Meeting"). (*Id.* ¶ 31.)

When Chen returned to the United States from his trip to China, he brought approximately $10,400 with him. (*Id.* ¶ 32.) Feng picked Chen up from the airport in Los Angeles on May 8, 2023. (*Id.* ¶ 33.) The next day, May 9, Chen called Agent-1 and asked to set up the May 14 Meeting. (*Id.*) Chen said he would be bringing a driver (Feng). Chen then reported to Feng that he (Chen) had made contact with "the other side," meaning the U.S. Government (Agent-1). (*Id.*)

On May 10, Chen spoke again with Agent-1. (*Id.* ¶ 34.) Agent-1 had informed Chen that the whistleblower complaint against the Shen Yun Performing Arts Center made a "weak case," and Chen discussed using the May 14 Meeting to develop a "plan." (*Id.*)

### 5. Chen and Feng Plan for the May 14 and May 15 Meetings

On May 12, 2023, Chen and Feng discussed their plans for the May 14 Meeting and the directions they were receiving from PRC Official-1. Chen and Feng used a particular communications application to communicate with PRC Official-1 and agreed to delete their conversations with PRC Official-1 in order to evade detection. Chen put Feng in direct contact with PRC Official-1 so that Feng could alert PRC Official-1 to any problems that might arise during the meetings (to "sound the alarm") and could receive instructions from PRC Official-1. (*Id.* ¶ 35.)

---

[1] According to IRS protocols and IRS personnel, a whistleblower complaint cannot advance through the IRS Whistleblower Program without a formal debrief of the whistleblower who filed the complaint.

4

### 6.  Chen Makes an Initial Bribe Payment at the May 14 Meeting

On May 14, 2023, Chen and Feng met Agent-1 at a restaurant in Newburgh, New York. At the restaurant meeting, where Chen and Feng were both present, Chen laid out the bribery agreement with Agent-1: if Agent-1 opened an audit on the Shen Yun Performing Arts Center, Agent-1 would receive a total of $50,000,[2] and Chen would make a down payment of 10% ($5,000) if Agent-1 began advancing the whistleblower complaint. Chen further promised Agent-1 that Agent-1 would receive 60% of any potential whistleblower award should the whistleblower complaint be successful. Chen and Agent-1 then went to Agent-1's car, where Chen gave Agent-1 $1,000 in cash. (*Id*. ¶¶ 36-37.)

The following day, on May 15, 2023, Feng drove Chen to Chen's "official" meeting at the IRS office in New Windsor. At that meeting, Chen sought to present a legitimate purpose for the whistleblower complaint—for instance, Chen said he was trying to protect the American taxpayer. (*Id*. ¶ 39.)

### 7.  Chen Reveals the PRC Government's Direction and Funding of the Whistleblower Complaint Scheme

Following the two meetings in New York, Chen and Feng returned to California. In phone calls with Agent-1, Chen continued to express the PRC Government's interest in the whistleblower complaint and tried to negotiate progress on the complaint in exchange for the remainder of the promised $50,000 upfront bribe payment. (*Id*. ¶¶ 40-41.) Chen said that the PRC Government was hesitant to pay more money until the IRS started on the complaint. (*Id*. ¶ 40.) Chen's "friends" from "inside the country"—meaning PRC Government officials—were worried that deteriorating

---

[2] As Chen informed Agent-1 in later phone calls, the bribe payments would come from China and had to be slowly smuggled into the United States to avoid currency reporting requirements. (PSR ¶ 47.)

relations between America and the PRC Government could affect the whistleblower scheme. (*Id.* ¶ 41.) Chen asked Agent-1 if he could provide "something in writing" so Chen could demonstrate to his PRC contacts that the scheme was advancing. (*Id.*)

In a call between Chen and Feng, the defendants discussed PRC Official-1's being "in charge of these matters." (*Id.* ¶ 42.) They also discussed how to get the remainder of the $5,000 initial payment to Agent-1. (*Id.*) Feng reported he could make a roundtrip flight to New York to deliver the rest of the cash. (*Id.*)

On May 16, 2023, Agent-1 emailed Chen a letter on IRS letterhead stating that the whistleblower complaint had been referred to the IRS's Audit Department. Chen promptly called Feng to tell him about the IRS letter, said that he would update the PRC Government, and told Feng that Chen would withdraw money for Feng to deliver to Agent-1. (*Id.* ¶ 43.) Chen also told Feng he would "contact Tianjin again."[3]

Chen continued to discuss the bribery payment with Agent-1. Chen told Agent-1 that the money was from "all of us," referring to his PRC Government contacts. (*Id.* ¶ 47.) Chen discussed that it would take time to bring the remainder of the $50,000 into the United States because "it is very risky bringing money into the US" and that "special methods" would be required. (*Id.*) Chen said he would return to China in June, and when he returned would make sequenced payments to Agent-1 in the following months. (*Id.*) Chen sought to avoid declaring cash brought into the United States. (*Id.*)

---

[3] "Tianjin" refers to the PRC Government department principally responsible for targeting the Falun Gong. (*See* PSR ¶¶ 18,43.)

### 8. Feng Delivers an Additional $4,000 to Agent-1 at JFK Airport

On May 18, 2023, Feng flew from California to John F. Kennedy Airport to meet with Agent-1 and deliver an additional $4,000 in cash. (*Id.* ¶ 44.) Chen informed Agent-1 that Feng would make two more trips to New York in the future to deliver two additional cash payments of $25,000. (*Id.* ¶ 48.)

### 9. Chen Discusses Additional Payments to Agent-1

In a call after Feng's delivery of $4,000, Chen again discussed bringing money from China to pay the bribes to Agent-1 for advancing the whistleblower complaint. Chen told Agent-1 that, during Chen's June trip to China, he would gather the additional bribe money. (*Id.* ¶ 48.) Chen told Agent-1 that Feng would make two more trips to New York to deliver $25,000 on each trip. (*Id.*)

### B. The Defendant's Guilty Plea

On July 24, 2024, the defendant pleaded guilty to Counts Two and Three of the Indictment pursuant to a plea agreement. The plea agreement stipulates that the total offense level, assuming that the defendant accepts responsibility to the satisfaction of the Government through his allocution and subsequent conduct prior to imposition of sentence, is 17 and that the defendant's criminal history category is I. (Plea Agmt. at 2-3.) The stipulated Guidelines sentencing range reflects the addition of two levels pursuant to Guidelines § 3B1.1(c) because Chen was an organizer, leader, or supervisor. (*Id.*)

The plea agreement stipulates to a Guidelines sentencing range of 24 to 30 months' imprisonment. (*Id.* at 4.) This stipulated Guidelines sentencing range is based on Count Three, bribery of a public official. (*Id.* at 2-3.) There is no Guideline applicable to Count Two, acting as an unregistered agent of a foreign power in violation of 18 U.S.C. § 951. In that circumstance, the provisions of Title 18, United States Code, Section 3553 control. U.S.S.G. § 2X5.1; *see also* Plea Agmt. at 2.

7

The defendant also agreed to the forfeiture of $50,000. (*Id.* at 2.)

### C. The Presentence Report

The Presentence Investigation Report prepared by Probation also calculates a total offense level of 17 (PSR ¶¶ 56-68), a criminal history category of I (*id.* ¶¶ 69-71), and a Guidelines sentencing range of 24 to 30 months' imprisonment. (*Id.* ¶ 107.)

Probation recommends a sentence of 24 months' imprisonment.[4] (*Id.* at 31-32.)

### D. The Defendant's Sentencing Submission

The sentencing submission from the defense requests that the Court impose a sentence of time served. (Def. Mem. at 11.)

## DISCUSSION

The Government respectfully submits that a sentence of 30 months' imprisonment, which is within the Guidelines sentencing range of 24 to 30 months' imprisonment, is the appropriate sentence in this case.

### I. Applicable Law

Although no longer mandatory, the Guidelines still provide strong guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. at 264. As the Supreme Court explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," and that "should be the starting point and the initial benchmark." *Gall*, 552 U.S. at 49. After calculating the Guidelines, the Court must consider the seven factors outlined in Title 18,

---

[4] By the time of the scheduled sentencing, Feng will have been in pretrial detention for approximately 16 months.

8

United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *id*. § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *id*. § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id*. § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 552 U.S. at 49-50 & n.6. In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

- to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

- to afford adequate deterrence to criminal conduct;

- to protect the public from further crimes of the defendant; and

- to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within the Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50, n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46. To the

9

extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 50.

## II.   Application

The Government respectfully requests that the Court impose a sentence of 30 months' imprisonment, the high end of the stipulated Guidelines range. The seriousness of the offense, the need to promote respect for the law, and the importance of affording adequate deterrence to criminal conduct, particularly in cases of a foreign power's repression of a disfavored group within the borders of the United States, all militate in favor of the requested sentence.

### A.   The Sentencing Guidelines

The sentencing range established by the Sentencing Guidelines, *see* 18 U.S.C. § 3553(a)(4)(A), supports a sentence of 30 months' imprisonment. The applicable Guidelines range of 24 to 30 months' imprisonment is based solely on the offense conduct for bribery. *Supra* at 7. The bribery Guidelines calculation understates the seriousness of the offense because it does not account for the fact that Chen was acting on behalf of a repressive government regime to persecute a disfavored religious minority.

### B.   The Defendant's History and Characteristics

The history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1), also support a sentence of 30 months' imprisonment. The defendant has no mitigating motives or external factors justifying his offense. He was not motivated by poverty, he did not suffer from a troubled upbringing, and—contrary to the defense's suggestion—there is no evidence that he acted because of duress or improper pressure from the PRC Government. *See* Defense Mem. at 6, 7.

Chen is the son of professional parents, with whom he enjoyed a close relationship and a happy childhood in a middle-class upbringing. (PSR ¶ 79.) He served in the Chinese military (*id.*)

10

and studied economics and finance at a university in Tianjin. (*Id.* ¶ 94.) The defendant immigrated to the United States in 1992, where he has been an entrepreneur and small business owner—by all indications, a successful one. (*Id.* ¶¶ 97-100.) He became a naturalized U.S. citizen in 2000. (*Id.* ¶ 76.)

Chen has deep ties to the PRC Government. Chen repeatedly referred to PRC Government officials as his "friends." (PSR ¶¶ 40, 41, 45.) Indeed, on one occasion, Chen called them "blood brothers," and described how "we"—Chen and his PRC Government friends—"started this fight" against the founder of the Falun Gong "twenty, thirty years ago." (PSR ¶ 45.) Chen said his friends in the PRC Government were "always with us." (*Id.*)

Chen's admissions about his close relationship with the PRC Government are borne out by other evidence obtained in the investigation. Well before the offense conduct at issue in this case, Chen proudly informed a reporter that he was a former government official in Tianjin and still held "an honorary position with the Chinese government as an overseas consultant." David Pierson, *Protest reflects a shift in Chinese Americans' views*, L.A. Times (April 26, 2008), *available at* https://www.latimes.com/archives/la-xpm-2008-apr-26-me-chinese26-story.html (last visited on November 4, 2024). Chen's electronic devices and online accounts further contain, among other things, photographs of Chen at a military parade and other events held in Beijing in in honor of the 70th anniversary of the Chinese communist revolution in 2019; the cover page of Chen's application to the Chinese Communist Party ("CCP"); a letter from the CCP approving Chen's membership; a photograph of Chen attending an event celebrating the 100th anniversary of the CCP in 2021; and a photograph of Chen meeting the current leader of the CCP and President of the PRC, Xi Jinping.

11


Photograph from 70th Anniversary military parade


Photograph of Chen (left) at 70th Anniversary event


Photograph of Chen (left) shaking hands with Xi (right)

Chen was extraordinarily proud of his history with the PRC Government and, in particular, his meeting with Xi. In a recorded call with Individual-1, Chen bragged that he had "climbed, climbed, climbed to this position" and that "Uncle Xi [Jinping] met me three times in ten years." Similarly, an electronic copy of a Chen's 2020 resume features the photograph of Chen meeting Xi and specifically notes that Chen met Xi three times.

Chen did not target the Falun Gong, commit bribery, and act as an unregistered agent of a foreign power because of fear or improper influence. To the contrary, Chen was aligned with the PRC Government and its goals and he acted as a full-fledged and enthusiastic participant in the crimes.

### C. Seriousness of the Offense and the Need for Deterrence

The seriousness of the offense, 18 U.S.C. § 3553(a)(2)(A), and need to afford adequate deterrence, § 3553(a)(2)(B), further support a sentence of 30 months' imprisonment. Chen clandestinely worked with PRC Government officials to wage a campaign against a disfavored religious minority, secretly acting as an agent of the PRC Government inside the United States. Chen made plans to use the PRC's money to pay a large bribe to an IRS agent to corrupt the administration of the U.S. tax code. He sought to pervert the IRS whistleblower program into a weapon.

The Falun Gong has long been one of the PRC Government's "five poisons"—what the CCP views as the primary threats to its continued autocratic rule over China. (PSR ¶ 16.) The other four "poisons" are supporters of Taiwan's independence, supporters of Tibetan independence, supporters of Uyghur independence, and the Chinese pro-democracy movement. A foreign interference commission established by the Canadian government recently found these five groups are the primary target of transnational repression by the PRC government, including being targeted outside of China. *See* Public Inquiry into Foreign Interference in Federal Electoral Processes and

13

Democratic Institutions: Initial Report, at 91 (May 3, 2024), *available at* https://foreigninterferencecommission.ca/fileadmin/user_upload/Foreign_Interference_Commission_-_Initial_Report__May_2024__-_Digital.pdf (last visited Nov. 4, 2024).

The 2024 Annual Threat Assessment of the U.S. Intelligence Community, *available at* https://www.dni.gov/files/ODNI/documents/assessments/ATA-2024-Unclassified-Report.pdf (visited November 4, 2024), lists China as the first state actor engaging in behavior that directly threatens U.S. national security. 2024 Annual Threat Assessment at 7. According to the Assessment, "China leads the world in applying surveillance and censorship to monitor its population and repress dissent. Beijing conducts cyber intrusions targeted to affect U.S. and non-U.S. citizens beyond its borders—including journalists, dissidents, and individuals it views as threats—to counter views it considers critical of CCP narratives, policies, and actions." *Id*. at 11. Further, "Officials of the PRC intelligence services will try to exploit the ubiquitous technical surveillance environment in China and expand their use of monitoring, data collection, and advanced analytic capabilities against political security targets beyond China's borders." *Id.* at 12. The U.S. Intelligence Community assesses that "[t]he PRC also probably will seek to maintain its public security bureaus also known as "overseas police stations" to monitor and repress the Chinese diaspora." *Id*. at 31.

Detecting, disrupting, and prosecuting transnational repression orchestrated by a foreign government with access to funds, infrastructure, intelligence resources, and is extraordinarily difficult. And deterring conduct that is committed for ideological, political, and geopolitical motives is even more so. Accordingly, in order to afford deterrence to those who would act as an unregistered agent of a foreign government, a substantial sentence is necessary.

14

### D. Sentences in Similar Cases

A sentence of 30 months' imprisonment would also be consistent with sentences imposed in analogous cases involving unregistered foreign agents. *See* 18 U.S.C. § 3553(a)(6). For example:

In *United States v. Buryakov*, S1 15 Cr. 73 (RMB) (S.D.N.Y.), the defendant was convicted following a plea of guilty for acting as an unregistered foreign agent of the government of the Russian Federation and sentenced to a term of imprisonment of 30 months in 2016. The defendant conducted economic and other research for the Russian Federation, attempted to gather non-public U.S. government documents on economic matters, and attempted to help the Russian Federation influence economic or business issues in the United States and Canada. *Buryakov*, Dkt. Entry No. 152 (Gov't Sent. Mem.) at 2-4. The plea agreement that stipulated that a sentence of 30 months' imprisonment was appropriate, and the sentencing court imposed that sentence. *Id*. at 1; *Buryakov*, Dkt. Entry No. 157 (judgment).

In *United States v. Chun*, 16 Cr. 518 (VM) (S.D.N.Y.), the defendant was convicted following a plea of guilty to acting as an unregistered agent of the PRC Government and sentenced to a term of imprisonment of 24 months' imprisonment in 2017. The defendant was an FBI electronics technician with a Top Secret security clearance who sold sensitive FBI information to Chinese officials over a period of years. The parties agreed that, although there was no sufficiently analogous Guideline, a range of 21-27 months' imprisonment was appropriate.

In *United States v. Alvarez*, 05 Cr. 20943 (KMM) (S.D. Fla.), the defendant was convicted following a guilty plea to conspiracy to act as an unregistered agent of the government of Cuba and sentenced to a term of imprisonment of 60 months in 2007. Over a period of approximately 30 years, the defendant responded to coded taskings sent by Cuban intelligence and sent reports back to Cuba in response to those taskings.

15

In *United States v. Duran*, 07 Cr. 20999 (JAL) (S.D. Fla.), the defendant was convicted following a trial of acting and conspiring to act as an unregistered agent of the government of Venezuela, and sentenced to a term of imprisonment of 48 months in 2009. The defendant came to the United States as an agent of the Venezuelan government in an attempt to bribe and/or extort a U.S. citizen. *See United States v. Duran*, 596 F.3d 1283, 1295-96 (11th Cir. 2010).

In *United States v. Dumeisi*, 03 Cr. 664 (SBC) (N.D. Ill.), the defendant was convicted following a trial acting and conspiring to act as an unregistered agent of the government of Iraq, as well as two counts of perjury. The Court sentenced the defendant to a total of 46 months of incarceration in 2004. The defendant reported on Iraqi dissidents and provided false identification documents for Iraqi intelligence officers.

Sentences of 18 months' imprisonment have been imposed in a small handful of cases that did not involve the defendant's leadership role, did not involve bribery, and in one case involved cooperation by the defendant:

In *United States v. Butina*, 18 Cr. 218 (TSC) (D.D.C.), the defendant was convicted following a plea of guilty to acting as an unregistered agent of the government of the Russian Federation and sentenced to a term of imprisonment of 18 months in 2019, based in part on the defendant's efforts to cooperate in the investigation after arrest. The defendant attempted to establish non-official channels of communication between the Russian Federation and Americans who had political influence in order to influence U.S. political opinion and action. *Butina*, Dkt. Entry No. 101 (Gov't Sent. Mem.) at 4-11.

In *United States v. Soueid*, No. 11 Cr. 494 (E.D. Va.), the defendant the defendant was convicted following a plea of guilty to acting as an unregistered agent of the government of Syria,

16

and sentenced to a term of imprisonment of 18 months. The defendant conducted surveillance of Syrian dissidents in the United States for the Syrian government.

In *United States v. Al-Awadi*, No. 07-CR-20314 (E.D. Mich.), the defendant was convicted following a plea of guilty to acting as an unregistered agent of the government of Iraq, and sentenced to a term of imprisonment of 18 months. The defendant reported on Iraqi dissidents within the United States for the Iraqi Intelligence Services.

A sentence of 30 months, like the sentence imposed in *Buryakov* (which is less than the sentences imposed in *Alvarez*, *Duman*, and *Dumeiei*) is warranted here. Unlike the defendants in *Butina*, *Soueid*, or *Al-Awadi*, Chen did not cooperate or attempt to cooperate (*Butina*), and his conduct was not limited to surveilling or reporting (unlike in *Soueid* and *Al-Awadi*). Instead, Chen undertook deliberate and calculated steps to actively target the Falun Gong. Moreover, (i) Chen was also convicted of bribery in addition to acting as an unregistered agent of a foreign power; (ii) Chen held a leadership or managerial role in the offense, supervising and directing his co-defendant Feng; and (iii) Chen was a former official in the government of the foreign power who maintained a close personal and ideological relationship with PRC government officials. Accordingly, sentenced imposed in other cases for similar conduct support the requested sentence of 30 months' imprisonment.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that a sentence of 30 months' imprisonment is appropriate to reflect the history and characteristics of the defendant, to

reflect the seriousness of the offense, and to afford adequate deterrence; and would be consistent with sentences imposed in analogous cases.

DAMIAN WILLIAMS
United States Attorney

by: _____/s/_____
Qais Ghafary / Michael D. Lockard / Kate Wheelock
Assistant United States Attorneys
(212) 637-2534 / -2193 / (914) 993-1966

Dated: White Plains, NY
       November 5, 2024